**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**FORT MYERS DIVISION**

| | |
|---|---|
| HAYDEN BLAKE GARDNER, | Case No.: |
| Plaintiff, pro se, sui juris, | |
| | 2:26-cv-1941-SPC-KRH |
| V. | |
| CITY OF NORTH PORT, a municipal corporation; MAHBOD FOLADVANDI, individually and in his official capacity; and CHRISTOPHER OPATZ, individually and in his official capacity, | **COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |
| Defendants. | **JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. This is a civil action for declaratory, injunctive, and monetary relief to redress the deprivation of rights, privileges, and immunities secured to the Plaintiff by the First, Second, Fourth and Fourteenth Amendments to the United States Constitution, and the laws of the State of Florida. The action is brought pursuant to 42 U.S.C. §§1983 and 1988. Plaintiff Hayden Blake Gardner, a United States Citizen and resident of Florida, brings this action to vindicate those rights against the unlawful and malicious conduct of the named Defendants, who, acting under color of state law, subjected him to an unlawful seizure, false arrest, malicious prosecution, and the systematic destruction of exculpatory evidence.

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) and (4) (civil rights). This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

1

3. Venue is proper in this district pursuant to 28 U.S.C. § 11391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and all Defendants reside in this district.

### III. PARTIES

4. Plaintiff HAYDEN BLAKE GARDNER is an adult over the age of eighteen, and at all times relevant hereto, was and is a citizen of the United States and resident of the State of Florida.

5. Defendant CITY OF NORTH PORT is a municipal corporation organized and existing under the laws of the State of Florida, and is responsible for the policies, practices, customs, and training of the North Port Police Department and its officers. The City of North Port may be served through its City Manager at 4970 City Hall Blvd., North Port, FL 34286.

6. Defendant MAHBOD FOLADVANDI, Badge #369, is, and at all times relevant to this complaint was, a sworn law enforcement officer employed by the North Port Police Department, acting under color of law. He may be served at the North Port Police Department, 4980 City Hall Blvd., North Port, FL 34286.

7. Defendant Christopher Opatz, Badge #470, is, and at all times relevant to this complaint was, a sworn law enforcement officer employed by the North Port Police Department, acting under color of law. He may be served at the North Port Police Department, 4980 City Hall Blvd., North Port, FL 34286.

8. All Defendants are sued in both their individual and official capacities.

### IV. STATEMENT OF FACTS

**A. The Pretextual Stop: A Search for a Crime Where None Existed**

9. On May 27, 2024, at approximately 2:26 a.m., Plaintiff HAYDEN BLAKE GARDNER (hereinafter "Plaintiff") was operating his vehicle, a 2002 Chevrolet Silverado, in a safe, prudent, and lawful manner within the City of North Port, Florida.

10. Defendant Officer Mahbod Foladvandi, Badge #369 (hereinafter "Defendant Foladvandi"), began following Plaintiff's vehicle for no less than 2.5 miles before initiating a stop.

11. During this prolonged surveillance, Defendant Foladvandi maintained a suspicious and distracting position in the general vicinity of Plaintiff's blind spot, thereby influencing the very driving patterns the officer would later cite as justification for the stop.

2

12. Defendant Foladvandi initiated a traffic stop on Plaintiff's vehicle, alleging that Plaintiff had "crossed the white line a couple of times."

13. The objective dash cam video evidence does not support the claim that Plaintiff crossed the white line multiple times. As the Supreme Court has held, where video evidence blatantly contradicts an officer's account, a court need not accept that account as true. Scott v. Harris, 550 U.S. 372, 380 (2007).

14. In his sworn testimony at the suppression hearing, Defendant Foladvandi admitted that the stop was, in whole or in part, a "well-being check" to ensure Plaintiff was not having a "medical emergency". This admission is fatal to any claim of reasonable suspicion for a criminal traffic stop.

15. Defendant Foladvandi did not issue a citation for any traffic violation, further evidencing the pretextual and baseless nature of the stop.

**B. The Unlawful Search: The Flashlight Intrusion and Physical Trespass**

16. Upon approaching Plaintiff's vehicle, Defendant Foladvandi immediately shined his flashlight into the interior of the vehicle, conducting a warrantless search of the vehicle's interior.

17. Plaintiff raised his hand to shield his eyes from the bright light and stated, "Officer, please" in a reasonable attempt to communicate discomfort and assert his right to be free from an unreasonable intrusion.

18. Defendant Foladvandi responded with a coercive and threatening statement: "I"m not gonna listen to you. I'm gonna have my lights on and you are gonna give me whatever I ask." This statement was not a request; it was a command, and it signaled to Plaintiff that he was not free to leave and was subject to the officer's absolute authority.

19. At the suppression hearing, the presiding judge made a preliminary finding that at this moment–upon the uttering of this coercive command–Plaintiff was in custody for purposes of Miranda v. Arizona, 384 U.S. 436 (1966). No Miranda warnings were ever administered.

**C. The "Peers" Exchange: The Officers' Demonstrated Ignorance of Constitutional Principles**

20. Plaintiff, attempting to understand the nature and legal basis for the encounter, asked Defendant Foladvandi, "Are we peers?"–a question directed at the fundamental constitutional principle of equality under the law.

3

21. Defendant Foladvandi responded, "I don't know what you're saying. You don't make sense at all," demonstrating a complete ignorance of the constitutional principles Plaintiff was invoking.

22. Defendant Christopher Opatz, Badge #470 (hereinafter "Defendant Opatz"), who had arrived on the scene, also admitted his ignorance, stating, "No, I'm gonna be honest with you, and I'm not grasping what you're trying to get at."

23. Both officers demonstrated a complete lack of understanding of the fundamental constitutional principle that all individuals, including law enforcement officers, are equal under the law and that a citizen has the right to understand the legal basis for a government intrusion upon his liberty.

**D. The Unlawful Physical Seizure: Opening the Door and Pulling Plaintiff Out**

24. Defendant Foladvandi demanded that Plaintiff exit the vehicle, issuing escalating and threatening commands without providing any lawful justification.

25. Plaintiff, justifiably concerned for his safety and asserting his right to understand the basis for the demand, asked why he needed to exit the vehicle.

26. Defendant Foladvandi refused to provide a lawful reason, instead escalating his threats: "Step out of the car for me, sir. I'm going to ask you one more time. I'm going to put you in handcuffs if you don't get out...Next time I'm not going to be that nice."

27. Before Plaintiff could comply, Defendant Foladvandi unlawfully opened Plaintiff's vehicle door without Plaintiff's consent, without a warrant, and without probable cause or exigent circumstances, physically seized Plaintiff, and pulled him from the vehicle. This act constituted both an unlawful seizure of Plaintiff's person and an unlawful trespassory search of his vehicle.

28. At the suppression hearing, Defendant Foladvandi admitted under oath that he did not see any weapons or anything Plaintiff could use to harm him before opening the door, thereby negating any officer safety justification for this warrantless physical intrusion.

**E. The Fabrication of Evidence and False Statements in Official Reports**

29. In his arrest report, Defendant Foladvandi claimed that Plaintiff was seen "driving between two lanes," a phrase that is not a legally recognized traffic violation under Florida law and which was fabricated to provide a post-hoc justification for the unlawful stop.

4

30. Defendant Foladvandi falsely claimed in his report that he read Plaintiff implied consent, a claim that is unsupported by the objective body camera evidence.

31. Defendant Foladvandi falsely claimed in his report that Plaintiff had "bloodshot and watery eyes," a claim Plaintiff explicitly denies and which is not corroborated by the objective body camera video evidence.

### F. The First Amendment Retaliation: The "Sovereign Citizen" Label

32. During the encounter, Defendant Foladvandi, in a transparent act of retaliation for Plaintiff's assertion of his constitutional rights, twice attempted to label Plaintiff a "sovereign citizen"–a term formally associated with domestic terrorism by the Federal Bureau of Investigation.

33. Plaintiff explicitly and unequivocally denied this label, stating, "I'm not saying I'm a sovereign citizen…a sovereign citizen is not a real thing."

34. Defendant Foladvandi persisted in this retaliatory labeling, stating, "Well, you have a tendency of it," thereby associating Plaintiff with a domestic terrorist designation in the official record.

35. This labeling was in direct retaliation of Plaintiff's assertion of his constitutional rights and was designed to intimidate Plaintiff, delegitimize his legal arguments, and provide a pretext for the arrest.

### G. Plaintiff's Disclosure of Autism and the Officer's Deliberate Disregard

36. During the encounter, Plaintiff disclosed to the officers, "I don't know that I'm autistic. I'm in the process of being diagnosed as autistic…I have tendencies," providing the officers with critical information that should have altered their approach and de-escalated the encounter.

37. The officers deliberately disregarded this disclosure and continued their aggressive, coercive, and threatening conduct, demonstrating a callous indifference to Plaintiff's disclosed neurological condition.

### H. The Failure to Intervene: Defendant Opatz's Active Complicity

38. Defendant Opatz was present during the majority of the encounter, assisted in the unlawful seizure, and personally witnessed Defendant Folavandi's unconstitutional conduct, including the coercive interrogation without Miranda warnings, and the retaliatory labeling.

5

39. Defendant Opatz had a clearly established duty to intervene to prevent unconstitutional violations he witnessed but failed to do so. Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000).

40. Instead of intervening, Defendant Opatz actively participated in the unlawful seizure and arrest, thereby rendering himself jointly and severally liable for all resulting constitutional violations.

## I. The Unlawful Seizure of Property

41. Following Plaintiff's unlawful arrest, Defendant Foladvandi ordered the towing of Plaintiff's vehicle from a private parking lot without a warrant, without probable cause, and without exigent circumstances, in violation of the Fourth Amendment's protection against unreasonable seizures of "effects." Soldal v. Cook County, 506 U.S. 56 (1992).

42. Defendant also confiscated Plaintiff's lawfully owned firearm, which was secured in the vehicle, and held it in evidence for approximately thirty (30) days without due process of law, in violation of Plaintiff's Second and Fourth Amendment rights.

## J. The Destruction of Exculpatory Evidence

43. Defendant Foladvandi claimed to have found an open container of alcohol (a Voodoo Ranger IPA) in Plaintiff's vehicle, which he photographed as evidence.

44. Defendant Foladvandi then deliberately poured out the remainder of the contents of the alleged open container and discarded the can, permanently destroying the only physical evidence that could have been independently tested to verify or refute his claims.

45. Defendant Foladvandi admitted under oath at the suppression hearing that this action deprived Plaintiff of the ability to have the alleged evidence independently tested, and that no fingerprints, DNA, or laboratory analysis was conducted on the alleged open container prior to its destruction.

46. This deliberate destruction of potentially exculpatory evidence constitutes a violation of Plaintiff's due process rights under California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988).

## K. The Malicious Prosecution

47. Based upon fabricated evidence, false statements in official reports, and evidence obtained through unconstitutional means, Defendant Foladvandi arrested Plaintiff and initiated a criminal prosecution for Driving Under the Influence.

48. Plaintiff was forced to defend himself against these baseless charges for nearly thirteen (13) months, acting pro se, at great personal, financial, and psychological cost.

**L. The Ongoing Harm: The Erroneous DWLS Notation on Official Record**

49. As a direct result of the unlawful arrest and malicious prosecution, an erroneous notation of Driving While License Suspended (DWLS) was placed on Plaintiff's official driving record.

50. This false and stigmatizing notation remains on Plaintiff's record despite the fact that all charges were ultimately dismissed, causing ongoing and continuing harm to Plaintiff's reputation, his ability to obtain insurance, and his employment prospects.

51. The presence of this erroneous DWLS notation resulted in Plaintiff abandoning his personal and occupational means of transportation during a hurricane (Milton) induced State of Emergency, subjecting his vehicle to complete and total destruction.

**M. The Severe Emotional, Psychological, and Physical Harm**

52. As a direct and proximate result of the unlawful arrest, the malicious prosecution, the humiliation he endured at the hands of jail processors, and the ongoing stigma of the erroneous DWLS notation, Plaintiff suffered severe and debilitating emotional distress.

53. Plaintiff was so profoundly depressed and traumatized from the unlawful arrest and unconstitutional actions of Defendants Foladvandi and Opatz, he was involuntarily institutionalized for forty eight (48) hours under the Baker Act following a welfare check requested by a concerned loved one on the evening of his release.

**N. The Favorable Termination: Nolle Prosequi**

54. On June 24, 2025, after nearly thirteen (13) months of Plaintiff's relentless pro se defense, the State Attorney's Office for the Twelfth Judicial Circuit entered a Nolle Prosequi, formally dismissing all charges against the Plaintiff.

55. The dismissal of the charges via Nolle Prosequi constitutes a favorable termination of the criminal proceedings for the purposes of a malicious prosecution claim. Thompson v. Clark, 142 S. Ct. 1332, 1341 (2022) (holding that a plaintiff need only show that the prosecution ended

7

without a conviction). This dismissal stands as a conclusive indictment of the Defendants' conduct and the utter absence of credible evidence to support the prosecution they initiated.

## V. CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 – Unlawful Seizure of Person and Property in Violation of the Fourth and Fourteenth Amendments (Against Defendants Foladvandi and Opatz)**

56. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

57. The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. A traffic stop constitutes a seizure of the person within the meaning of the Fourth Amendment. Terry v. Ohio, 392 U.S. 1 (1968); Whren v. United States, 517 U.S. 806 (1996).

58. Such a seizure is only permissible if it is supported by reasonable, articulable suspicion that a traffic violation has occurred or that criminal activity is afoot. United States v Arvizu, 534 U.S. 266 (2002). The stop must be "justified at its inception." Terry, 392 U.S. at 20. Furthermore, Defendant Foladvandi's physical intrusion into the vehicle by opening the door without consent, a warrant, or probable cause constituted an unlawful trespassory search under United States v. Jones, 565 U.S. 400 (2012), and violated Plaintiff's reasonable expectation of privacy under Katz v. United States, 389 U.S. 347 (1967).

59. Defendant Folavandi lacked the requisite reasonable suspicion to initiate the traffic stop. His stated justifications–that Plaintiff "crossed the white line a couple of times" and was "driving between two lanes"–are pretextual, contradicted by the objective video evidence, and, in the case of the latter, not a legally recognized traffic violation. As the Supreme Court held in Scott v. Harris, 550 U.S. 372 (2007), where video evidence blatantly contradicts an officer's testimony, the court must credit the video.

60. Furthermore, Defendant Foladvandi admitted under oath at the suppression hearing that the stop was a mere "well-being check." A well-being check cannot be used as a pretext to conduct an investigatory stop absent reasonable suspicion of criminal activity. The authority for the stop "ends when tasks tied to the traffic infraction are–or reasonably should have been–completed." Rodriguez v. United States, 575 U.S. 348, 354 (2015). Once Defendant Foladvandi determined Plaintiff was not in medical distress, the justification for the seizure evaporated entirely.

8

61. The unreasonable seizure of Plaintiff's person was exacerbated by the unlawful seizure of Plaintiff's property. The towing of Plaintiff's vehicle from a private lot and the confiscation of his lawfully owned firearm constituted seizures of his "effects" without a warrant, probable cause, or exigent circumstances, in direct violation of the Fourth Amendment. Soldal v Cook County, 506 U.S. 56 (1992).

62. Defendant Opatz is liable for this constitutional violation as he was present, had a reasonable opportunity to intervene to prevent the unlawful seizure, and failed to do so. Priester v City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000).

63. The rights violated herein were clearly established at the time of the violation, and no reasonable officer could have believed that initiating a traffic stop based on fabricated or pretextual justifications, and then physically opening a citizen's vehicle door without consent or probable cause, was constitutionally permissible. Defendants are therefore not entitled to qualified immunity.

## COUNT II: 42 U.S.C. § 1983 – Violation of the Second and Fourteenth Amendments (Against Foladvandi and Opatz)

64. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

65. The Second Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects an individual's fundamental, pre-existing, Creator-endowed right to keep and bear arms for self-defense. District of Columbia v. Heller, 554 U.S. 570 (2008); McDonald v. City of Chicago, 561 U.S. 742 (2010).

66. This right is not limited to the home. The confiscation of Plaintiff's lawfully owned firearm, which was secured in his vehicle, constituted a direct infringement on his fundamental right to bear arms. See Caetano v. Massachusetts, 577 U.S. 411 (2016) (holding that the Second Amendment extends to all bearable arms). Under the standard established in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022), the government bears the burden of demonstrating that any regulation or seizure is consistent with the Nation's historical tradition of firearm regulation. There is no historical analogue for the arbitrary disarmament and confiscation of a firearm from a non-dangerous citizen during a pretextual traffic stop.

9

67. Defendants Foladvandi and Opatz, acting under color of law, infringed upon Plaintiff's Second Amendment rights by unlawfully confiscating his firearm and retaining it for approximately thirty (30) days without due process of law. This deprivation was not justified by any legitimate law enforcement objective, as Defendant Foladvandi admitted under oath that he did not observe any weapons or threatening conduct before seizing Plaintiff.

68. The right to be free from the warrantless confiscation of a lawfully possessed firearm by a government officer lacking any articulable justification was clearly established at the time of the violation. Defendants are therefore not entitled to qualified immunity on this count.

**COUNT III: 42 U.S.C. § 1983 – False Arrest in Violation of the Fourth and Fourteenth Amendments (Against Defendants Foladvandi and Opatz)**

69. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

70. The Fourth Amendment requires that an arrest be supported by probable cause. Beck v. Ohio, 379 U.S. 89 (1964). Probable cause exists only when "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man or reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949).

71. Defendant Foladvandi arrested Plaintiff without a scintilla of probable cause. He relied upon his own embellished observations, information obtained through an unlawful search (the flashlight intrusion and the warrantless opening of the vehicle door), and statements coerced from Plaintiff during a custodial interrogation conducted in the complete absence of Miranda warnings. All evidence obtained after the initial unlawful stop constituted fruit of the poisonous tree and could not lawfully form the basis for probable cause. Wong Sun v. United States, 371 U.S. 471 (1963).

72. It is clearly established law in the Eleventh Circuit that an arrest based on fabricated evidence and a pretextual stop devoid of reasonable suspicion violates the Fourth Amendment, theory defeating and claim of qualified immunity at the pleading stage. Kingsland v. City of Miami, 382 F.3d. 1220, 1232 (11th Cir. 2004) (holding that an officer who makes a false arrest based on fabricated evidence is not entitled to qualified immunity).

10

73. Defendant Opatz is liable for the false arrest because he was present, knew that Defendant Foladvandi lacked probable cause, and had a reasonable opportunity to intervene but failed to do so. Byrd v. Clark, 783 F.2d (11th Cir. 1986).

**COUNT IV: 42 U.S.C. § 1983 – First Amendment Retaliation (Against Defendant Foladvandi)**

74. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

75. Plaintiff engaged in speech protected by the First Amendment when he questioned the legality of the stop, asserted his constitutional rights, challenged the officer's authority, and invoked the principle of equality under the law by asking "Are we peers?"

76. Defendant Foladvandi's decision to arrest Plaintiff was substantially motivated by Plaintiff's protected speech. This retaliatory animus is evidenced by the immediate temporal proximity between Plaintiff's assertion of his rights and Defendant Foladvandi's escalation to physical seizure. It is further evidenced by Defendant Foladvandi's own testimony that he found Plaintiff "argumentative," his repeated and baseless attempts to label Plaintiff a "sovereign citizen," and his coercive statement, "I'm not gonna listen to you." These acts collectively demonstrate that Defendant Foladvandi's purpose was to silence and punish Plaintiff for exercising his First Amendment rights.

77. The absence of probable cause for the arrest further strengthens the inference that the arrest was retaliatory. Nieves v. Bartlett, 139 S. Ct. 1715, 1724 (2019). It is clearly established that retaliatory arrest for the exercise of protected speech violates the First Amendment. Defendant Foladvandi is therefore not entitled to qualified immunity on this count.

**COUNT V: 42 U.S.C. § 1983 – Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (Against Defendants Foladvandi and Opatz)**

78. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

79. To state a claim for malicious prosecution under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. Thompson v. Clark, 142 S. Ct. 1332, 1337 (2022).

80. Defendants Foladvandi and Opatz caused a criminal proceeding to be commenced against Plaintiff without probable cause and with actual malice. The proceeding terminated in Plaintiff's favor via a Nolle Prosequi on June 24, 2025, satisfying the favorable termination element as articulated in Thompson v. Clark. The baseless prosecution constituted a continuing seizure of Plaintiff's person in violation of the Fourth Amendment, as Plaintiff was subjected to the ongoing conditions and restraints of the criminal process for nearly thirteen months.

81. The element of malice is established by, inter alia, Defendant Foladvandi's deliberate fabrication of evidence, his false statement in official sworn reports, his deliberate destruction of exculpatory evidence (the alleged open container), and his initiation of charges despite knowing he lacked probable cause. Such conduct goes far beyond mere negligence and constitutes the malice required to sustain this claim.

**COUNT VI: 42 U.S.C. § 1983 – Deprivation of Due Process (Stigma-Plus) in Violation of the Fourteenth Amendment (Against Defendants Foladvandi and Opatz)**

82. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

83. As a direct result of the unlawful arrest and malicious prosecution, an erroneous Driving While License Suspended (DWLS) notation was placed on plaintiff's official driving record by the State of Florida.

84. The presence of this false and stigmatizing information on Plaintiff's record, coupled with the tangible deprivation of his liberty and property interests–including the concrete impact on his insurance rates, his employment prospects, and his ability to exercise his fundamental right to travel without fear of further unlawful detention–constitutes a "stigma-plus" violation of his procedural due process rights under the Fourteenth Amendment. Paul v. Davis, 424 U.S. 693 (9176). The "plus" factor is satisfied by the ongoing, concrete, and quantifiable harm to Plaintiff's state-created property interest in an accurate driving record.

85. Plaintiff bore added anxiety and distress when confronted whether to risk additional punitive measures in the form of increased insurance rates, marks on Plaintiff's criminal record, and further stigmatization, while considering the notion to evacuate for Hurricane Milton. Ultimately, Plaintiff chose not to drive his vehicle, securing alternative transportation for his person safely out of the storm's path, but leaving behind his only real possession of significant financial value subject to total loss, potentially disabling him of his primary means of earning a living.

86. Defendants have failed to provide Plaintiff with any process to correct this erroneous and damaging information, resulting in an ongoing and continual constitutional violation.

**COUNT VII: 42 U.S.C. § 1983 – Municipal Liability (Against Defendant City of North Port)**

87. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

88. The City of North Port is liable for the constitutional violations suffered by Plaintiff pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), on the following independent and alternative grounds.

89. First, Failure to Train. The City of North Port's failure to adequately train and supervise its officers on fundamental constitutional principles amounts to deliberate indifference to the rights of individuals with whom its officers come into contact. City of Canton v. Harris, 489 U.S. 378 (1989). The need for training in the following areas was so obvious that the City's failure to provide it constitutes deliberate indifference: (a) the requirements for reasonable suspicion to initiate a traffic stop under Terry v. Ohio; (b) the durational limits of traffic stops and the prohibition against extending a stop beyond its original purpose under Rodriguez v. United States; (c) the requirements for probable cause to arrest under Beck v. Ohio; (d) the duty to preserve exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), and California v. Trombetta, 467 U.S. 479 (1984); (e) the duty of officers to intervene to prevent constitutional violations by fellow officers; (f) the prohibition against retaliatory arrest for the exercise of First Amendment rights; and (g) the proper handling and return of lawfully possessed firearms seized during a traffic stop.

90. Second, De Facto Custom or Policy. The City of North Port, through its supervisory personnel, has maintained and condoned a de facto custom, policy, or practice of tolerating pretextual traffic stops, retaliatory arrests, the destruction of exculpatory evidence, and the filing of false statements in official sworn documents. The conduct of Defendant Foladvandi–including the fabrication of a non-existent traffic violation, the deliberate destruction of evidence, and the retaliatory labeling of a citizen as a domestic terrorist–is so egregious and so systemic in its disregard for constitutional norms that it could not have occurred absent the City's deliberate indifference to and tacit approval of such conduct.

13

91. Third, Ratification. To the extent that the City of North Port, through its final policymakers, was aware of the unconstitutional conduct of Defendant Foladvandi and Defendant Opatz and took no corrective action, the City ratified their conduct, thereby making it official City policy. City of St. Louis v. Praprotnik, 485 U.S. 112 (1988).

92. The City of North Port's unconstitutional policies, customs, and failures to train were the "moving force" behind the violations of Plaintiff's constitutional rights. Board of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397 (1997).

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff HAYDEN BLAKE GARDNER respectfully prays that this Honorable Court enter judgment in his favor and against the Defendants, jointly and severally, as follows:

1. For compensatory damages in an amount to be determined at trial, but not less than $1,500,000 to compensate Plaintiff for his economic losses (including towing fees, costs of recovering his firearm, and lost income), loss of liberty, deprivation of his Second Amendment rights, emotional distress, humiliation, reputational harm, pain and suffering, and the severe psychological trauma evidenced by his involuntary commitment under the Baker Act;

2. For punitive damages against Defendant Foladvandi in an amount to be determined at trial, but not less than $2,500,000, for his malicious, willful, wanton, and deliberate disregard for Plaintiff's Creator-endowed constitutional rights, including his fabrication of evidence, destruction of exculpatory evidence, and retaliatory conduct;

3. For punitive damages against Defendant Opatz in an amount to be determined at trial, but not less than $750,000, for his reckless disregard for Plaintiff's constitutional rights and his deliberate failure to intervene to prevent the constitutional violations he personally witnessed;

4. For a declaratory judgment that the acts, policies, and practices of the Defendants violated the Plaintiff's rights under the First, Second, Fourth and Fourteenth Amendments to the United States Constitution;

5. For an injunction ordering Defendant City of North Port to implement a comprehensive, court-supervised constitution training program for its officers, and ordering the immediate expungement and correction of the erroneous DWLS notation from Plaintiff's official driving record;

6. For Plaintiff's reasonable litigation fees and litigation cost pursuant to 42 U.S.C. § 1988;

14

7. For such other and further relief as this Honorable Court deems just and proper.

## VII. JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff HAYDEN BLAKE GARDNER hereby demands a trial by jury on all claims and issues so triable in this action. VIII. VERIFICATION I, Hayden Blake Gardner, the undersigned Plaintiff, do hereby declare and affirm under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in the above-styled action, that I have read the foregoing Complaint and know the contents thereof, and that the factual allegations contained therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _____7_____ day of ____June____, 2026.

_____

HAYDEN BLAKE GARDNER

Plaintiff, Pro se, sui juris

Respectually submitted,

_____

HAYDEN BLAKE GARDNER

Plaintiff, In Propria Persona

2134 Boxwood St

North Port, FL 34289

(941) 549-1725

hayden.gardner1007@gmail.com

15